# IN THE UNITED STATES DISTRICT COURT
# FOR THE EASTERN DISTRICT OF OKLAHOMA

| | |
|---|---|
| SHARITA K. NIPPER, )<br>)<br>Plaintiff, )<br>)<br>v. )<br>)<br>CAROLYN W. COLVIN, )<br>Acting Commissioner of the Social )<br>Security Administration, )<br>)<br>Defendant. ) | Case No. CIV-13-336-SPS |

## OPINION AND ORDER

The claimant Sharita Kay Nipper requests judicial review of a denial of benefits by the Commissioner of the Social Security Administration pursuant to 42 U.S.C. § 405(g). She appeals the Commissioner's decision and asserts that the Administrative Law Judge ("ALJ") erred in determining she was not disabled. For the reasons discussed below, the Commissioner's decision is hereby REVERSED and REMANDED to the ALJ for further proceedings.

**Social Security Law and Standard of Review**

Disability under the Social Security Act is defined as the "inability to engage in any substantial gainful activity by reason of any medically determinable physical or mental impairment[.]" 42 U.S.C. § 423(d)(1)(A). A claimant is disabled under the Social Security Act "only if h[er] physical or mental impairment or impairments are of such severity that [s]he is not only unable to do h[er] previous work but cannot, considering h[er] age, education, and work experience, engage in any other kind of

substantial gainful work which exists in the national economy[.]" *Id*. § 423 (d)(2)(A). Social security regulations implement a five-step sequential process to evaluate a disability claim. *See* 20 C.F.R. §§ 404.1520, 416.920.[1]

Section 405(g) limits the scope of judicial review of the Commissioner's decision to two inquiries: whether the decision was supported by substantial evidence and whether correct legal standards were applied. *See Hawkins v. Chater*, 113 F.3d 1162, 1164 (10th Cir. 1997). Substantial evidence is "'more than a mere scintilla. It means such relevant evidence as a reasonable mind might accept as adequate to support a conclusion.'" *Richardson v. Perales*, 402 U.S. 389, 401 (1971), *quoting Consolidated Edison Co. v. NLRB*, 305 U.S. 197, 229 (1938). *See also Clifton v. Chater*, 79 F.3d 1007, 1009 (10th Cir. 1996). The Court may not reweigh the evidence or substitute its discretion for the Commissioner's. *See Casias v. Secretary of Health & Human Services*, 933 F.2d 799, 800 (10th Cir. 1991). But the Court must review the record as a whole, and "[t]he substantiality of evidence must take into account whatever in the record fairly detracts

---

[1] Step one requires the claimant to establish that she is not engaged in substantial gainful activity. Step two requires the claimant to establish that she has a medically severe impairment (or combination of impairments) that significantly limits her ability to do basic work activities. If the claimant *is* engaged in substantial gainful activity, or her impairment *is not* medically severe, disability benefits are denied. If she *does* have a medically severe impairment, it is measured at step three against the listed impairments in 20 C.F.R. Part 404, Subpt. P, App. 1. If the claimant has a listed (or "medically equivalent") impairment, she is regarded as disabled and awarded benefits without further inquiry. Otherwise, the evaluation proceeds to step four, where the claimant must show that she lacks the residual functional capacity (RFC) to return to her past relevant work. At step five, the burden shifts to the Commissioner to show there is significant work in the national economy that the claimant *can* perform, given her age, education, work experience and RFC. Disability benefits are denied if the claimant can return to any of her past relevant work or if her RFC does not preclude alternative work. *See generally Williams v. Bowen*, 844 F.2d 748, 750-51 (10th Cir. 1988).

from its weight." *Universal Camera Corp. v. NLRB*, 340 U.S. 474, 488 (1951). *See also Casias*, 933 F.2d at 800-01.

## Claimant's Background

The claimant was born July 15, 1963, and was forty-eight years old at the time of the administrative hearing (Tr. 27). She completed her GED, and has worked as a laundry attendant and sandwich maker (Tr. 41, 153). The claimant alleges inability to work since March 12, 2010, due to staph infections (MRSA), mental illness, and high blood pressure (Tr. 152).

## Procedural History

On April 6, 2010, the claimant applied for supplemental security income benefits under Title XVI of the Social Security Act, 42 U.S.C. §§ 1381-85. Her application was denied. ALJ Richard J. Kallsnick conducted an administrative hearing and ALJ David W. Engel, writing for ALJ Kallsnick, determined that the claimant was not disabled in a written opinion dated November 25, 2011 (Tr. 11-19). The Appeals Council denied review, so ALJ Engel's written opinion is the Commissioner's final decision for purposes of this appeal. *See* 20 C.F.R. § 416.1481.

## Decision of the Administrative Law Judge

The ALJ made his decision at steps four and five of the sequential evaluation. He found that the claimant had the residual functional capacity (RFC) to perform a limited range of light work as defined in 20 C.F.R. § 416.967(b), *i. e.*, she can lift/carry twenty pounds occasionally and ten pounds frequently, and stand/walk/sit for six hours in an eight-hour workday, and use her hands and feet for controls. Additionally, he found that

she is able to remain attentive and carry out work satisfactorily, able to perform simple work with routine supervision, able to relate to co-workers and supervisors on a superficial basis for work purposes only, able to have minimal contact with the public, and can adapt to work like situation (Tr. 15). He noted that she has symptoms consistent with her impairments, but she is able to remain attentive (Tr. 15). The ALJ thus concluded that she was not disabled because she could return to her past relevant work as a laundry attendant; alternatively, he concluded that she was not disabled because there was work she could do in the national and regional economies, *e. g.*, mail clerk, electrical assembler, machine operator, and production assembler (Tr. 17-18).

## Review

The claimant's arguments on appeal all relate to her mental impairments, *i. e.*, she contends that the ALJ erred: (i) by failing to determine she could perform the mental demands of her past relevant work, (ii) by failing to properly evaluate the medical and nonmedical source evidence, (iii) by failing to properly assess her credibility, and (iv) by failing to find that her mental impairments met a listing. Because the Court finds that the ALJ failed to properly evaluate the claimant's mental impairments, the decision of the Commissioner must be reversed and the case remanded for further proceedings.

The medical evidence reveals that the claimant had the severe impairments of mood disorder, anxiety disorder, hypertension, and staph infections (Tr. 13). As relevant to this appeal, the claimant received treatment at Okmulgee Memorial Hospital on January 20, 2010, for multiple superficial lacerations on her left forearm, depression, and intoxication (Tr. 208). She was then transported to Brookhaven Hospital for inpatient

treatment until January 26, 2010. Upon discharge, the claimant was diagnosed with major depressive disorder, recurrent, severe, with psychotic features; panic disorder without agoraphobia, and a global assessment of functioning (GAF) score of 49 (she was assessed a GAF of 18 upon admission) (Tr. 234). Notes on discharge indicate the claimant was "back on track," but anticipated a possible relapse of depression and therefore referred her to CREOKS of Okmulgee for follow-up treatment (Tr. 236). Treatment notes from CREOKS indicate that the claimant was initially assessed with bipolar disorder mixed, with psychotic features, and panic disorder, and assessed a GAF of 46 (Tr. 281). By April 13, 2010, the claimant reported hearing whispering noises, shadows, and that she was also having marital problems (Tr. 279).

Dr. Michael D. Morgan, Psy. D., conducted a consultative mental examination of the claimant on July 16, 2010. He noted that the claimant had been receiving treatment at CREOKS since February 2010 and that she described her treatment as ineffective, and further that she was "not forthcoming with useful information concerning her daily function, social functioning, and her ability to perform self-care tasks," and that she agreed her mental impairments were not severe enough to interfere with her ability to provide care for her son (Tr. 303-304). He noted that she had a history consistent with alcohol and substance dependence with physiological dependence including symptoms of tolerance and withdrawal (Tr. 305). During the exam, Dr. Morgan indicated that the claimant was oriented to time, place, person, and purpose; had normal speech; did not meet the criteria for a major depressive disorder, bipolar disorder, or schizophrenia, and opined that her affect likely stemmed from a personality disorder, and that she met the

criteria for an anxiety disorder (Tr. 305). He assessed her with the Axis I diagnoses of: anxiety disorder NOS (primary), alcohol dependence with physiological dependence, nicotine dependence with physiological dependence, cannabis dependence with physiological dependence in sustained full remission, opioid dependence with physiological dependence in sustained full remission, and noncompliance with treatment (Tr. 307). For Axis II, he indicated borderline personality disorder, and assessed her with a GAF of 61-65 (Tr. 307).

State physician Dr. Cynthia Kampschaefer, Psy. D., completed a Psychiatric Review Technique form on August 3, 2010, indicating that the claimant had mild limitation with regard to activities of daily living, and moderate limitations with difficulties in maintaining social functioning and difficulties in maintaining concentration, persistence, or pace, and indicated that she had one or two episodes of decompensation, each of extended duration (Tr. 319). She also completed a mental RFC assessment, finding that the claimant was markedly limited in the ability to understand and remember detailed instructions, the ability to carry out detailed instructions, and the ability to interact appropriately with the general public (Tr. 323-324). She opined that the claimant could perform simple tasks with routine supervision, could relate to supervisors and peers on a superficial work basis, could not relate to the general public, and could adapt to a work situation (Tr. 325).

On September 8, 2010, the claimant reported hearing voices again, that she had started cutting herself again, and that she was burning herself; she reported she could no longer see "Ken" anymore due to lack of insurance, and was tearful to the point that the

doctor suggested she go to the hospital, and the claimant agreed to go if she deteriorated (Tr. 347). On October 13, the claimant reported her medications made her groggy, and she appeared tired and unkempt, but agreed to call and/or come in if she had any suicidal thoughts (Tr. 348). On November 10, the claimant missed her appointment, likely because she was admitted to Wagoner Community Hospital through the emergency department on November 10, 2010, and discharged the next day (Tr. 341-344). Notes on discharge indicate that the claimant had been admitted for suicidal ideation with a plan "to get a gun and blow her brains out," and psychotic audio hallucinations (Tr. 342). She was referred to CREOKS for follow-up treatment (Tr. 342). Her final diagnosis on discharge was schizoaffective disorder bipolar type and polysubstance abuse, with a GAF of 40 (Tr. 343). Follow-up notes from CREOKS indicate that the claimant denied suicidal ideation on November 23, and was reportedly eating more (Tr. 350). The following month her affect was bright and energy was up, and in January 2011 the claimant reported even moods and that she had slept a lot (Tr. 351-352). On February 22, 2011, the claimant reported being "manic" for three or four days, had not taken her medications, and cried continuously through the appointment. The doctor noted that she believed the claimant "is too emotional & upset to be functional" and that she needed an inpatient assessment (Tr. 353).

On July 24, 2011, the claimant was admitted to Okmulgee Memorial Hospital after overdosing on Restoril because she "wanted to kill [her]self because [she] started taking crank again and it has caused a lot of problems with my husband and I" (Tr. 356). She was only there a few hours before leaving out a side door (Tr. 355, 359).

The claimant's mother submitted a Third Party Function Report, indicating she had a strained relationship with her daughter and did not know the answers to many of the questions (Tr. 177). However, she did indicate that the claimant had "family problems," but "can't give reason why" (Tr. 182). She further indicated that the claimant had problems getting along with people in authority in the past, and that she handled stress very poorly in the past (Tr. 183). In the "Remarks" section, she indicated that the claimant has "problems with employment, immediate family, extended family and obviously has her own personal (mental) problems," and that she had taken custody of the claimant's firstborn child in 1996 due to "her inability to cope" (Tr. 184). She indicated she perhaps saw the claimant monthly and that the claimant dealt with stress that "seems to have no answer" (Tr. 184).

In his written opinion the ALJ summarized the claimant's hearing testimony, as well as some of the medical evidence. He noted the claimant's treatment at CREOKS through April 2010, using her statements that she went out with her husband, spent family time and went on float trips as against her credibility, but failed to mention any of the CREOKS treatment records after that time, including the continued suicidal ideation (Tr. 16). The ALJ summarized Dr. Morgan's consultative examination in great detail, finding that the examination undermined the claimant's credibility because she was not "forthcoming" and reported she could care for her 13-year-old son (Tr. 17). The ALJ noted the claimant's suicidal ideation in July 2011 and that she left against medical advice, then adopted the opinions of the state reviewing physicians, including the August 2010 mental RFC assessment that pre-dated her multiple hospitalizations for suicidal

ideation (Tr. 17). The ALJ thus determined that the claimant was not disabled (Tr. 17-19).

"An ALJ must evaluate every medical opinion in the record, although the weight given each opinion will vary according to the relationship between the disability claimant and the medical professional. . . . An ALJ must also consider a series of specific factors in determining what weight to give any medical opinion." *Hamlin v. Barnhart*, 365 F.3d 1208, 1215 (10th Cir. 2004), *citing Goatcher v. United States Department of Health & Human Services*, 52 F.3d 288, 290 (10th Cir. 1995). The pertinent factors include: (i) the length of the treatment relationship and the frequency of examination; (ii) the nature and extent of the treatment relationship, including the treatment provided and the kind of examination or testing performed; (iii) the degree to which the physician's opinion is supported by relevant evidence; (iv) consistency between the opinion and the record as a whole; (v) whether or not the physician is a specialist in the area upon which an opinion is rendered; and (vi) other factors brought to the ALJ's attention which tend to support or contradict the opinion. *See Watkins v. Barnhart*, 350 F.3d 1297, 1300-1301 (10th Cir. 2003), *citing Drapeau v. Massanari*, 255 F.3d 1211, 1213 (10th Cir. 2001). Here, the ALJ merely *recited some* of the medical evidence (without providing any analysis of it under the governing standards for evaluating such evidence, and even ignoring large swaths of evidence) and stated his conclusions without connecting them to the evidence. This was especially important to do here given the serious concerns regarding the claimant's ability to function, much less perform work. Nor did the ALJ provide any

explanation; he merely adopted Dr. Kampschaefer's opinion without analysis or acknowledging that her opinion pre-dated much of the evidence in the record.

Furthermore, the ALJ failed to mention, much less analyze, any of the GAF scores assigned to the claimant. "Although the GAF rating may indicate problems that do not necessarily relate to the ability to hold a job," *see Oslin v. Barnhart*, 69 Fed. Appx. 942, 947 (10th Cir. 2003) [unpublished opinion], "[a] GAF score of fifty or less . . . *does* suggest an inability to keep a job," *Lee v. Barnhart*, 117 Fed. Appx. 674, 678 (10th Cir. 2004) [emphasis added] [unpublished opinion], *citing Oslin*, 69 Fed. Appx. at 947. Instead of simply rejecting GAF scores as non-dispositive, the ALJ should at a minimum have discussed the claimant's sub-50 scores and explained why they were not due to any occupational factors. *See Simien v. Astrue*, 2007 WL 1847205 at *2 (10th Cir. June 28, 2007) ("The ALJ was tasked with determining the level of [claimant's] functioning within the six domains, yet he made no mention of [claimant's] GAF ratings. We agree . . . that he could not simply ignore this evidence."); *Givens v. Astrue*, 251 Fed. Appx. 561, 567 n.4 (10th Cir. 2007) (noting that "the Commissioner argues that a low GAF score may indicate problems that do not necessarily relate to the ability to hold a job[,]" but finding that "[e]ven assuming this is true, the ALJ's decision does not indicate he reached the conclusion that Ms. Givens' low GAF score was due to non-occupationally-related factors.").

Last, the ALJ failed to even mention, much less properly assess, the Third Party Function Report. Social Security Ruling 06-03p (SSR 06-03p) provides the relevant guidelines for the ALJ to follow in evaluating "other source" opinions from non-medical

sources who have not seen the claimant in their professional capacity. *See* Soc. Sec. Rul. 06-03p, 2006 WL 2329939 (Aug. 9, 2006). SSR 06-03p states, in part, that other source opinion evidence, such as those from spouses, parents, friends, and neighbors, should be evaluated by considering the following factors: (i) nature and extent of the relationship, (ii) whether the evidence is consistent with other evidence, and (iii) any other factors that tend to support or refute the evidence. Soc. Sec. Rul. 06-03p, 2006 WL 2329939, at *5-6. The ALJ thus wholly failed to properly evaluate the Report in accordance with the factors set out in SSR 06-03p. The ALJ's task in evaluating credibility of lay witness testimony is precisely to determine whether the witness's opinion is sincere or insincere, and then determine what weight, if any, to ascribe to the opinion or testimony. *See Spicer v. Astrue*, 2010 WL 4176313, at *2 (M.D. Ala. Oct. 18, 2010) (finding that an ALJ's rejection of a lay witness statement because it was not a substitute for an appropriate medical opinion must *not* be based on a rationale that "applies with equal force to every 'lay statement.'"). Notably, while it may be appropriate for the ALJ to reject lay witness testimony that is based on the subjective complaints of a claimant when the ALJ has already determined that the claimant is not credible, *see, e.g., Valentine v. Commissioner Social Security Administration*, 574 F.3d 685, 694 (9th Cir. 2009) ("Mrs. Valentine's testimony of her husband's fatigue was similar to Valentine's own subjective complaints. Unsurprisingly, the ALJ rejected this evidence based, at least in part, on 'the same reasons [she] discounted [Valentine's] allegations.' In light of our conclusion that the ALJ provided clear and convincing reasons for rejecting Valentine's own subjective complaints, and because Ms. Valentine's testimony was similar to such complaints, it

follows that the ALJ also gave germane reasons for rejecting her testimony."), he is not entitled to reject *all* lay witness testimony without even acknowledging it. The ALJ is perfectly capable of separating the evidence that is based on the personal observations of the lay witness and, on the other hand, the evidence presented by the lay witness that is based on claimant's subjective complaints. *See also Baker v. Bowen*, 886 F.2d 289, 291 (10th Cir. 1989) ("[W]here the record on appeal is unclear as to whether the ALJ applied the appropriate standard by considering all the evidence before him, the proper remedy is reversal and remand.") [citation omitted].

Because the ALJ failed to properly analyze evidence of record as to the claimant's mental limitations, the Commissioner's decision must be reversed and the case remanded for further analysis by the ALJ. If such analysis results in adjustments to the claimant's RFC, the ALJ should re-determine what work the claimant can perform, if any, and ultimately whether she is disabled.

## Conclusion

The Court hereby FINDS that correct legal standards were not applied by the ALJ, and the Commissioner's decision is therefore not supported by substantial evidence. The decision of the Commissioner is accordingly REVERSED and the case is REMANDED for further proceedings consistent herewith.

**DATED** this 17th day of March, 2015.

_____
**STEVEN P. SHREDER**
**UNITED STATES MAGISTRATE JUDGE**